## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| Fiona Chen, | |
| Plaintiff, | Case No. 3:14-cv-50164 |
| v. | Honorable Iain D. Johnston |
| Janet Yellen, Secretary of the Department of the Treasury, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Fiona Chen brings this action *pro se* against the Secretary of the U.S. Department of the Treasury ("the Secretary") under Title VII of the Civil Rights Act of 1964. She claims a hostile work environment based on her race and national origin and retaliation for pursuing redress with the Equal Employment Opportunity Commission (EEOC). She has failed to establish a prima facie case of either claim, however, so the Secretary is entitled to summary judgment.

### I.     Background

The facts recited here are taken from the parties' Local Rule 56.1 statements of undisputed facts and, at times, from the exhibits and depositions directly. The Court notes that Plaintiff Fiona Chen occasionally attempted to dispute facts by citing to her complaint's allegations and to the Secretary's answer in paragraphs in which the Secretary either did not admit the allegation or explicitly denied them. But a complaint's allegations are not evidence, they are allegations. "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary

material." N.D. Ill. L.R. 56.1(e)(3). Other times, she failed to cite any evidence in support of her disputes. Still other times, she cited evidence that did not support her propositions, or explicitly supported the opposite point. In those instances, the fact statements are deemed admitted. The Court has made every effort to include all facts that can possibly aid Chen's story. At this stage, the Court is obligated to tell "the most persuasive story possible on the non-movant's behalf" and ask "whether a verdict in her favor would be reasonable or could result only from irrational speculation." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 928 (7th Cir. 2020).

Fiona Chen—who is originally from Taiwan—began working for the Department of the Treasury, in the Internal Revenue Service (IRS), as a revenue agent on September 23, 2002. Dkt. 223, ¶ 4. Although she began working for the IRS in September 2002, her claims of hostile work environment and retaliation center around her last approximately year and a half of employment there. In June 2006, she was selected to join Rebecca Solano's team with the Small Business/Self Employed (SBSE) Business Division. *Id.* ¶ 5. Solano was her first-line manager, followed by Midwest SBSE Territory Manager Mark Primoli, and then Area Director Farris Fink. Solano, who was involved in the interview process, rated Chen as an excellent candidate and specifically requested that she be selected to join the team. *Id.* Salano stated, "I rated Fiona as excellent above all other candidates." Dkt. 190-6, Solano Dep. 6:3–13. Solano did not request anyone else.

On a few occasions, Solano needed to select employees to serve as acting managers on a temporary basis. Chen took issue with not being selected. Solano explained in her deposition that she used several factors in determining which employees would serve that function. First, she looked for "available existing non-bargaining unit" employees. Dkt. 223, ¶ 21. Then she focused on individuals with career development plans. In other words, she wanted to give experience to employees that expressed interest in moving into a management position in the future. Dkt. 190-6, Solano Dep. 9:5–12. After that, Solano looked at tenure; how long the employee had been in the group. Then, she considered their grade. *Id.* at 9:13–15. These criteria were not explained to Chen. But Chen had never expressed interest in management and had not established a career development plan with Solano. *Id.* 9:16–24; Dkt. 189-7, at 2 ("In the context of Tuesday's (2/20/07) discussion, I do not intend to meet and make a career development plan at this point.").

The record establishes six occasions in which Solano assigned acting managers. On July 24, 2006, shortly after Chen joined the group, Solano needed an acting manager for one day. Chen was not selected because she was on assignment as an acting manager with her previous group. Next, on October 2, 2006, Chen was apparently available, but was not selected because a non-bargaining unit group employee was available, and Solano testified that she prioritized those individuals over the others. Next, an acting manager was needed for March 12 through 16, 2007. Chen was not selected for that instance for the same reason. An acting

3

manager was next needed from May 18 though 25, 2007. Chen was not selected for that assignment because she was scheduled for pre-approved leave on at least some of those days. Two additional instances exist in the record in which Solano needed acting managers, but by that time Chen was no longer in the group, though she still did some work for the group. Dkt. 223, ¶ 22.

In February 2007, Solano issued an evaluation of Chen's performance since joining the team, which was then reviewed by Mark Primoli. Solano graded Chen a 4.8 out of 5 with an overall assessment of outstanding or "exceeds fully successful" in each category. Dkt. 223-4, at 57–59. She noted that Chen had continued to perform at the level recorded in her previous manager's departure rating. *Id*. at 59. She further explained that Chen was "always courteous and professional in [her] dealing with [her] peers and management"; that she "graciously" agreed to return to her previous team for a month to fill in as acting manager; and that Chen consistently supported "a work environment free from harassment and discrimination." *Id*. The appraisal narrative further described Chen's work papers as "exemplary and always include a detailed audit trail and are easy and clear to follow." *Id*. at 61.

Notwithstanding the positive evaluation, Chen took issue with the way Solano handled a group meeting in March 2007. There, Solano gave a presentation on the new employee performance evaluation system. She explained what the group needed to do to meet expectations under the new system. Dkt. 223, ¶ 23. Someone in the group asked what happens if an employee receives a rating of two out of five.

4

Another employee responded that "you get fired." *Id.* ¶ 25. Solano then explained in detail the requirements to terminate an employee.

Chen interpreted that as an aggressive and harassing conversation. She further believed that the purported aggression was directed at her, even though Solano was apparently just responding to another employee's unprompted statement that the low rating would result in termination. In support of that theory, Chen asserts that Solano turned and looked directly in Chen's eyes while explaining how Solano could terminate an employee. Chen explained in her deposition that the people at the meeting were seated at a U-shaped table. Solano was seated at the bottom center of the U so that she could address everyone without turning around. Chen was seated near the bottom of one of the wings of the table. Dkt. 223, at 405, Chen Dep. 64:12–24, 65:1–21. The configuration of the table is only important to point out that Solano did not have to turn around to look at anyone. Another employee, who was present at the meeting, testified that Solano looked around the room at different people while talking, but that she may have looked at Chen more often than others because other employees were looking out the window, eating donuts, or doodling. Dkt. 223-4, at 46. At no time did that employee perceive that Solano was directing the conversation at Chen. *Id.* On Chen's telling of the story, however, Solano looked her directly in the eyes about three times. Dkt. 223, at 407, Chen Dep. 66:4–8 ("But she didn't do that with everybody. She glanced, okay. But with me she turned around and look at and

5

describe. And she did this several times. To say the exact times, I would say around three times.").

In response to the purportedly aggressive meeting, Chen filed a grievance with the union. In the grievance, the union alleged that Solano had created a hostile work environment in the meeting. Dkt. 223, ¶¶ 26, 30. Solano's supervisor, Mark Primoli, responded to the grievance by interviewing employees that were present at the meeting. *Id.* ¶ 27. He interviewed six individuals, but then stopped the interviews after concluding that the grievance could not be substantiated. *Id.* ¶ 29. Those employees had described the meeting as "calm, rational, and completely professional." *Id.* ¶ 28. Primoli asked them if Solano made them feel "bullied, intimated, or threatened." Dkt. 190-9, at 28. They responded that she did not. *Id.* at 28, 32. One person that attended the meeting apparently broke down into tears afterward. But that appears related to the stress of the workload rather than Solano's behavior. *Id.* at 48. Based on the individuals he interviewed, Primoli concluded that Solano had not acted aggressively or inappropriately in the meeting.

Around the same time, Chen started having computer problems. She complained that her laptop battery fell out and that her computer was functioning so poorly that she could not print. She wanted to be on the list to get a new computer. She contends that Solano's failure to ensure she received new equipment is an example of her harassing behavior. The evidence tells a different story. On March 6, 2007, Chen sent an email to Solano explaining that IT could not get her computer fixed and that she needed a new one. She conveyed the battery issue and

explained that she was having software trouble. Dkt. 188-13, at 7. A trouble ticket in the record shows that Chen had complained of the battery problem, and that Solano had approved the trouble ticket request on that same day, March 6, 2007, at 3:12 p.m. eastern time. Dkt. 223-4, at 102. That ticket was later closed on March 22, 2007, after a technician spoke with Chen and confirmed that she would wait for her name to appear on the computer refresh list. Dkt. 188-13, at 20. Regardless, Solano sent an email on April 7, 2007 requesting that Chen be added to the computer refreshment list and noting that her computer problems were causing a work stoppage. *Id.* at 17. She then continued working over the next few days to provide the necessary details to ensure the request would be fulfilled. *Id.* at 11–17. The remaining emails in the exhibit largely do not involve Solano, but they show that Chen continued having computer issues and was eventually given a loaner laptop until she could get a new one. In all, the record shows that Chen opened two trouble tickets regarding her computer issues. Chen opened the first on March 6, at 11:51 a.m.; Solano approved it the same day at 3:12 p.m. Dkt. 189-1, at 2. Chen opened the second ticket at 4:45 p.m. on April 10; Solano approved that ticket the next morning at 8:55 a.m. *Id.* at 3–4.

Later that year, Chen transferred to another division. She joined the Large and Mid-Sized Business Division (LMSB) as a financial products and transactions specialist on June 10, 2007. Because she was leaving SBSE, Solano and Primoli needed to conduct a departure evaluation documenting Chen's performance since the earlier evaluation. Dkt. 223, ¶ 32. Solano rated Chen a 4.8 once again but

included a narrative explaining that she had not continued to perform at the same level. *Id.* ¶ 31. Apparently because of that disagreement, Chen refused the sign the departure evaluation. Dkt. 188-11, at 2. Even though Solano kept the numerical score the same as the prior evaluation, her narrative told a significantly different story. Initially, she explained that Chen was always "courteous and professional" in dealing with her peers, and that she was always cooperative with team members. *Id.* Solano went on to explain, however, that Chen had made numerous procedural errors that caused Solano extra work. Those errors included using incorrect codes, filling forms out incorrectly, and not properly assembling documentation in case files. *Id.* at 10.

On one occasion, a taxpayer had complained about Chen's professionalism. The taxpayer explained that Chen displayed a hostile and overly aggressive demeanor during the audit process and accused her of taking the facts and coloring them to suit her purpose. *Id.* at 11. Solano further noted that during the meeting with the taxpayer (Solano was present), Chen "sat and smiled." *Id.* Solano apparently found that disrespectful of the taxpayer's complaint because she later reiterated the need to respect customer perspectives and, in the performance review, referred Chen to internal documentation to aid her improvement in that area. *Id.* Chen, however, took the notation that she "sat and smiled" as disrespectful to her country of origin. Dkt. 188-3, at 10.

Solano's narrative continued to point out other procedural errors in Chen's work. She noted time charges not being documented, forms only partially correct, and she noted issues with language in one report:

> I was unable to execute the 30-day letter for issuance because the unagreed report was not complete, clear, and professional. The written language was not easy for me, as a reader, to understand. In addition, the report contained spelling and grammatical errors. As a result, it was necessary for me to re-write the unagreed report (worker classification issue, failure to file/pay penalties).

Dkt. 188-11, at 12. She further noted that, on another case, Chen did an excellent job gathering the facts, but the written work was hard to follow because of sentence structure and grammatical errors. *Id*. at 13. In other cases, Chen had failed to develop the reasoning necessary to support the argument and defend the government's position. *Id*. at 12, 14. On another case, Solano explained that Chen had inappropriately included a personal statement about the taxpayer and accused Chen of using it as "a very personal attempt to influence potential readers." *Id*. She further explained that the same report also included unclear language with grammar and spelling errors. *Id*. Another time, Chen had delayed closing a case so long (without proper explanation) that Solano believed the individual would be warranted in seeking relief due to the unnecessary delay. *Id*. at 14.

Chen took issue with this departure rating. Notwithstanding the high score (which was just adopted from the prior score), the narrative was not positive. She further complains that Primoli refused to remove the departure evaluation from her personnel file; she relies on her belief that Primoli settled complaints this way with

other agents in the past. No explanation how those cases are relevant or similar to this one was provided.

In her new job at LMSB, Chen's immediate supervisor was Jamy Kilmnick, followed by Territory Manager Gayle Trier. Dkt. 223, ¶ 6. Here again, Chen's relationship with her supervisor soured. Although Chen wanted another evaluation performed, Kilmnick had not been her supervisor long enough to perform one. Instead, he relied on Solano's departure rating as Chen's mid-year evaluation. *Id*. ¶ 39. According to Trier, the union contract prevented Kilmnick from performing the mid-year evaluation and instead the prior recordation acted as the mid-year review. In this case, that was Solano's departure rating. Dkt. 190-10, Trier Dep. 69:15–23; Dkt. 223, ¶ 41.

At the beginning of Chen's time in Kilmnick's group, the work he could assign her was limited. She had yet to attend corporate training, or the necessary specialty training in financial products. ¶ 42. The Secretary refers to her as a trainee during this period. Chen counters that she needed to attend training but was not a trainee. The difference doesn't matter. At bottom, Chen had not attended the specialty training required of members of her new group. Chen was Kilmnick's first employee to go through this training period (he began as an acting manager and was promoted to the full-time position soon after), and he explained that the process has since changed entirely. But at that time, Kilmnick assigned Chen some practice cases to review to evaluate how she would handle them. Dkt. 190-7, Kilmnick Dep. 48:21–24, 49:1–24, 50:1–2. In those practice cases, Kilmnick had Chen complete

10

issue write-ups, but she did no field work and did not see the assigned agents. She was only asked to review the case files and write documents discussing the issues. Dkt. 223, at 524, Chen Dep. 183:1–7. Then, Kilmnick assigned her a veteran coach who she shadowed, which allowed her to go out into the field and assign hours toward cases. *Id*. 184:14–15.

At the same time, Solano's group was now short staffed. Though Solano transferred some of Chen's cases to other agents, she wanted Chen to finish a few other cases because they were almost done. Solano explained that the cases contained some procedural and written errors that needed to be corrected and she believed assigning them to other agents would have created an unreasonable burden and delay on the taxpayers. Dkt 190-6, Solano Dep. 24:19–24, 25:1–11; Dkt. 190-7, Kilmnick Dep. 43:7–17.

As Chen sees it, being told to continue working on cases for Solano after being hired by Kilmnick's group was done to harass her. Dkt. 223, at 527, Chen Dep. 186:17–22. In support of her assertion that the work was assigned to harass her, she cites to her deposition. But a deponent's subjective belief is not evidence that the Court can rely on at summary judgment. *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 847 (7th Cir. 2007) ("We understand that he suspects that this is the case, but his own subjective belief cannot substitute for evidence.").

On June 19, 2007, right after Chen joined his group, Kilmnick began taking notes on his interactions with her. Dkt. 189-2, at 14. In his notes (the "secret notes" as Chen refers to them), Kilmnick explains that he started the journal at the

11

suggestion of his boss, Gayle Trier. *Id*. He admits that he did not share his notes with Chen, and that he also felt the notes were necessary because he believed Chen was taking notes about him. Dkt. 223, ¶ 67. He further explains that he had a "protracted" conversation with Chen on June 12, 2007, two days after she was hired to join the group, over her work location and travel arrangements. He noted that Chen continued to raise her voice, and he asked why she was doing that. According to Kilmnick, she responded that her voice was higher because she is a woman, noted the lack of other women in the group, and asked him if he had a problem with women. Dkt. 189-2, at 14–16. She then accused him of being prejudiced against people with accents. *Id*. at 16. He then ended the conversation and asked Trier for assistance. *Id*. at 17. Trier advised him to apologize to Chen and to say he regretted the phone call, which he then did. *Id*.at 17–18.

Chen also seemed to assert that Kilmnick laughed at her accent, though the record is not clear on that. He testified that he did not. She responded to the Secretary's Local Rule 56.1 statement of fact on that point by citing to Kilmnick's notes and asserting that he once asked her "what are you laughing at?" Dkt. 223, ¶ 65. That response does not counter Kilmnick's testimony, nor is it even relevant to the statement of fact. N.D. Ill. Local Rule 56.1(e)(3) ("To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.").

Before joining Kilmnick's team, Chen worked ten hours a day, four days a week. She wanted to continue that schedule, but he advised her that she should change her schedule to the typical eight hours a day, five days a week. She took issue with that, and at times has asserted that this amounts to discriminatory harassment because others were not forced to work that schedule. Kilmnick testified in his deposition, however, that he told Chen that she should work that standard schedule because she was in training and should be working the same schedule as the individuals training her. Kilmnick Dep. 13:14–20. She sees this as evidence that she was treated differently. But as Kilmnick pointed out, she was his only employee in training (his first ever), so his instruction would have only applied to her. *Id.* 13:21–24, 14:1–16.

Chen also complained about the method of travel to downtown Chicago. Kilmnick advised her during the interview process that travel to downtown Chicago would be required. Chen wanted to drive, but he advised her that regulations required her to take public transportation instead and that nobody was authorized to drive. Dkt. 223, ¶ 63. She took issue with this because she had been allowed to drive in the past with other teams. She further contends that she a hard time navigating public transportation with her files and her computer and that other agents had parking spaces at taxpayer locations. *Id.*

Trier, as Territory Manager, met with Chen soon after Chen began working for Kilmnick. *Id.* ¶ 68. Because of how the working relationship began, Trier discussed with Chen the group's history with respect to women employees and

13

attempted to welcome Chen into the group. *Id.* On Chen's telling of the story, however, Trier threatened to send her back to Solano's group (which Trier didn't have the authority to do anyway) and told her that she didn't want people in the group that would file EEO complaints. *Id.* Trier responds, however, that she did not say any such thing. Dkt. 189-12, at 11. (As discussed later, this obvious factual dispute is insufficient to prevent summary judgment.)

Chen also complained about not receiving a mid-year evaluation after joining Kilmnick's team. She wanted Solano's departure rating removed and for Kilmnick to perform a new evaluation instead. Trier, however, explained that Kilmnick was the acting manager, had no prior management experience, and he was not Chen's manager long enough to be allowed to give her a mid-year evaluation. She explained that he would have had to be her manager for at least sixty days before writing a mid-year review. Therefore, Trier explained that Solano's departure rating of Chen would act as the mid-year review. Dkt. 189-12, at 11–12. The appraisal period ended on July 31, 2007, and Chen joined Kilmnick's group on June 10, 2007. Thus, sixty days would not have passed. The rule was required by the collective bargaining agreement, which stated, "If there is a change from one (1) permanent position to another during the last sixty (60) days of the appraisal year, the departure rating(s) becomes the rating(s) of record for the appraisal period." *Id.* at 12.

On August 21, 2007, Chen sought pre-EEO counseling, which resulted in an interview on August 27, 2007. Dkt. 223, ¶ 8; Dkt. 188-2. In the interview, she

14

complained about Solano's negative statements in Chen's departure rating, which she believed provided her new supervisor with an unfavorable opinion of her and would damage her future appraisals. She complained about the number of exhibits that Solano attached to the departure rating (forty pages), which Solano attached as examples of Chen's errors. The interview narrative further explains that Chen believed Solano was biased against her because of her accent and her status as a minority, though it provides no specific support for this other than Chen's subjective belief. Chen explained that all employees make errors of some kind, but they do not receive such lengthy narratives in their ratings, though she did not describe how she was aware of the errors other employees had made, what those errors were, or how they compared to her own. Dkt. 188-2, at 3.

On October 12, 2007, Chen filed an administrative EEO complaint (as compared to her August 21, 2007, pre-EEO counseling). Dkt. 223, ¶ 8. Lesia Panepinto was designated as her representative for the complaint. Dkt. 188-3, at 2. In that complaint, Chen reiterated her contention that Solano's departure rating narrative was inappropriate and harmful to Chen. She also believed that Solano had given her reviews that contained untrue statements, and that Solano refused to change the reviews. Dkt. 188-3, at 4–5. She also explained that Mark Primoli had neglected to inform her that she had been selected for promotion. According to Chen, "He then called and told me that he forgot about me, and I was assigned to Rebecca Solano's group." *Id*. at 7. She then explained that she asked Solano for a quality step increase on February 28, 2007, but that Solano had declined to afford

15

her that promotion. *Id*. She then explained concerns with Solano being an overbearing supervisor: "For example, in our first group meeting in September 2006, I listened to her saying for eight hours how she was going to write us up if we failed to do this or that. For example, she said even if we were just five minutes late, we needed to go to her in person to ask for permission to work overtime for five minutes. In the 2006 Christmas party, she described herself as with Napoleon Syndrome." *Id*. Chen does not explain how this overbearing supervisory style was discriminatory. Indeed, her statement's use of the word "we" seems to acknowledge that Solano used this managerial style with all her employees. *See also id*. at 7–8 ("The whole group went around the table to express their dissatisfaction about her management. During and after the meeting, Manager Solano showed remorse and said that she would change her practice.").

In the EEO complaint, Chen also complained about how Solano handled so-called drop file materials that were sent to Solano from one of Chen's previous managers. Solano had apparently moved some of those files to Chen's permanent employee file, even though Chen believed the files should have been destroyed. *Id*. at 9. Chen explained that Solano disagreed about whether the files should be destroyed and told Chen to "find laws by myself." *Id*. After a union grievance, most of the files were removed. *Id*. Chen next complained that Solano wrote a case file review on one of Chen's cases after Chen had left the group to join Kilmnick's group. Solano then sent that review, which she wrote on June 14, 2007, to Kilmnick and

16

Chen. Chen believed the review was false. *Id*. She then filed a grievance to have the review removed from her record, which was successful. *Id*.

On November 2, 2007, Kilmnick called the Chicago office of the U.S. Treasury Inspector General for Tax Administration (TIGTA). According to the TIGTA complaint narrative, he learned from Lesia Panepinto (she was a union steward and Chen's designated representative in her EEO complaint) on October 31, 2007, that Chen had performed research on Kilmnick and Trier. Chen had learned that Kilmnick and Trier were linked to the same physical address. Dkt. 238-1. According to Kilmnick, Chen performed background checks on him and Trier and had told Panepinto that Kilmnick and Trier were engaged in an affair.[1] Chen had left a voicemail to that effect with Panepinto, but Panepinto had refused to provide it.[2] Regardless of whether that information is true, it caused Kilmnick to call TIGTA. He explained that he feared for his personal safety because an employee was inappropriately investigating him. He also believed that his reputation was at stake because of Chen's accusations regarding the affair. Dkt. 190-7, Kilmnick Dep. 54:12–24, 55:1–24, 56:1–23. He also mentioned to Agent Johnson that Chen had previously opened an EEO complaint. *Id*. 59:5–9. Based on this information, Kilmnick had called Trier, who called her boss. They agreed that a referral to TIGTA was warranted. *Id*. 58:5–9.

---

[1] Due to the sensitive nature of this kind of rumor, the Court further notes that there is no evidence that this is true. In fact, the testimony appears to show that it is not. Dkt. 190-10, Trier Dep. 92:12–24, 93:1–23.

[2] Gayle Trier, in her deposition, confirmed that Panepinto was a union steward and was not supposed to release information on another bargaining unit employee. Dkt. 190-10, Trier Dep. 94:17–20.

Although Chen classifies the referral to TIGTA as a criminal investigation, the documented report clearly indicates that it was non-criminal. The report further indicates the reason for non-investigation as "mgmt/personnel/labor relation." Dkt. 238-1, at 2. The complaint was then referred to the IRS Employee Conduct and Compliance Office (ECCO) on November 29, 2007. *Id*. at 3. Paul Johnson was the agent gathering facts regarding the TIGTA complaint. He was primarily a criminal investigator, but he took the phone call from Kilmnick that day because he was on telephone duty. He explained in his deposition that he performed an initial investigation, but that the referral was made for informational purposes only and never resulted in a full-fledged investigation. Dkt. 190-12, Johnson Dep. 4:11–18, 5:19–21, 8:9–12; 19:13–17. Other than Agent Johnson's usual role as a criminal investigator, there is no evidence that the TIGTA referral was ever a criminal investigation. On the contrary, the documentation expressly explains otherwise.

On January 5, 2008, Chen resigned from the IRS. Although she admits that she resigned, she asserts that she was constructively discharged because of a hostile work environment. Dkt. 223, ¶ 7.

## II.   Analysis

Summary judgment is warranted if the evidence presents no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The Court must "construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013) (quoting *Goetzke v. Ferro Corp.*, 280 F.3d 766, 774 (7th Cir.

18

2002)). The initial burden lies with the movant to either show an absence of evidence supporting an essential element or to present affirmative evidence showing that an essential element cannot be satisfied. *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). Then, the burden shifts to the nonmoving party to present evidence that establishes a genuine issue of material fact as to that element. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009) ("Thus, to survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case."). Furthermore, a plaintiff's own subjective belief that something is true is not evidence sufficient to defeat a motion for summary judgment. *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 700 (7th Cir. 2002).

### a.  Count I—Hostile Work Environment

In Count I, Chen asserts a claim that she was subjected to a discriminatory hostile work environment. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a claim of employment discrimination under Title VII, a plaintiff must prove that she is a member of a protected class, that she suffered an adverse employment action, and that the employer took the adverse action because of the plaintiff's status as a member of the

19

protected class. *Gates v. Bd. of Educ. of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019).

"Subjecting an employee to a hostile work environment counts as an adverse action

. . . within the meaning of Title VII's prohibition of race discrimination in 42 U.S.C.

§ 2000e-2(a)." *Id.*; *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir.

2016) (quoting *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014)). The

Secretary does not dispute that Chen is a member of a protected class. Instead, the

Secretary disputes the existence of a hostile work environment and the causal

element.

To establish a claim of hostile work environment under Title VII of the Civil

Rights Act of 1964, a plaintiff must prove that "(1) the employee was subject to

unwelcome harassment; (2) the harassment was based on a reason forbidden by

Title VII—here, race; (3) the harassment was so severe or pervasive that it altered

the conditions of employment and created a hostile or abusive working

environment; and (4) there is a basis for employer liability." *Smith v. Ill. Dep't of

Transp.*, 936 F.3d 554, 560 (7th Cir. 2019).

Though the Secretary spent most of her brief arguing that any harassment

was not severe or pervasive, she also contends that Chen has not shown that the

conduct constituted harassment at all, and that Chen has failed to present any

evidence establishing that any of the conduct had anything to do with her race. Dkt.

187, at 34. Here, Chen has produced no evidence that any harassment was based on

her race or national origin. Even if she had, she has not shown that she was

subjected to any severe or pervasive harassment.

20

### i. Causation—Element Two

Chen has not produced any evidence that any of her supervisors' actions were based on her race or national origin. In *Smith*, the Court also determined that the plaintiff had failed to produce any evidence of causation. *Smith*, 936 F.3d at 561. There, Smith was subjected to abusive language and curse words. Noting that Title VII does not impose a general civility code, the Seventh Circuit held that, because Smith produced no evidence that his supervisors' conduct was because of race, "the profanity that he describes does not establish a hostile work environment." *Id*. 560–61. Like Chen, Smith contended that his supervisors harassed him, but the Seventh Circuit explained that not all harassment is actionable under Title VII. Even if workplace abuse is severe, Title VII does not offer Chen a remedy unless she can produce evidence that the abuse was based on her race or national origin. *Id*. at 561.

Similarly, in *Orton-Bell v. Indiana*, night shift employees were engaging in sexual conduct on Orton-Bell's desk. 759 F.3d 768, 774 (7th Cir. 2014). The Seventh Circuit explained that the conduct was subjectively and objectively offensive and severe, and that it was pervasive. But the court also explained that Orton-Bell had failed to show the activity had anything to do with her gender. The Court stated, "The notion that night-shift staff had sex on her desk *because* she was a woman is pure speculation." *Id*.

Here, Chen has not pointed to any evidence that any harassment (if she was subjected to any) was based on her race or national origin. Instead, she merely speculates that it was. That is not enough. Indeed, the Court strains to locate any

21

facts in the record that could possibly be used to even reasonably infer causation. Chen does little to reveal them herself. She points to her accusation that Kilmnick laughed at her accent, though she did not effectively dispute his denial of that fact. Even then, that has nothing to do with Solano (who was the object of Chen's EEO complaint). She seems to think that Solano's departure rating provides evidence of discriminatory animus, but Chen doesn't refute that Solano's criticisms were accurate. Presumably, Solano has a duty to accurately document Chen's shortcomings in an employee evaluation. Chen seems to believe that others have not received such lengthy and negative departure narratives, but she supplies no evidence.

Chen also points out that Kilmnick opened a TIGTA complaint on her. It was temporally close to her EEO complaint, and Kilmnick mentioned the EEO complaint when he spoke with Agent Johnson. But Chen complained almost entirely about Solano in the EEO complaint, not Kilmnick. And Trier agreed that the TIGTA referral was appropriate. Furthermore, Kilmnick and Trier explained that the TIGTA complaint was opened because Chen was performing background checks on them and had falsely accused them of having an affair. Kilmnick also felt concerned for his safety and reputation. Chen has produced no evidence at all that this legitimate, nondiscriminatory justification is mere pretext; that it is a lie. *Liu v. Cook Cnty.*, 817 F.3d 307, 316 (7th Cir. 2016) ("Even if an employer's decision was mistaken, there is no pretext so long as the decision-maker honestly believed the non-discriminatory reason.").

22

Chen also seems to misunderstand the burden on summary judgment. After the Secretary shows an absence of evidence, or presents evidence that an element cannot be met, Chen has the burden to point to evidence in the record that establishes a question of fact for the jury. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009). But Chen seems to argue that the only burden lies with the Secretary. Chen contends, "Defendant presented no facts in the documents presenting any other employee of the IRS being subject to the same routine treatment like Chen." Dkt. 226, at 21. That is a misunderstanding of the summary judgment procedure. The Secretary has shown an absence of evidence in the record to establish a causal link between any purported hostile work environment and Chen's race or national origin. Chen, therefore, bears the burden of proving or at least showing a genuine issue of material fact that any hostile work environment existed *because* of her race or national origin. After the aid of discovery, if she wanted to present evidence that she was treated differently than others outside her protected class, then she bore the burden of presenting it, not the Secretary. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 723–24 (7th Cir. 2018) ("Ultimately, the plaintiff bears the burden of showing the individuals he identifies are similarly situated.").

Similarly, Chen asserts, "To qualify as a normal working environment, the Treasury must present facts showing that all their employees encountered the same type of treatment, keeping secret noted on them, laughing at their accent, concocting a secretive criminal investigation on them, keeping them with outdated equipment and not taking remedies, keeping them underpaid while other received

promotions." Dkt. 226, at 21. As explained above, however, the Secretary bears no such burden. And Title VII does not require a "normal work environment." It only requires that any hostile work environment not be created because of discriminatory animus. The record here is void of any causal link.

Although Chen has produced a litany of complaints against her supervisors at the IRS, she has produced no evidence of discrimination. The only evidence in the record even relevant to Chen's protected class is the fact that she is a member of that protected class. But if a plaintiff's mere status as a member of a protected class were enough to show that workplace disagreements were because of her race or national origin, then every hostile work environment would be actionable. They are not, so the Secretary is entitled to summary judgment on Count I for that reason alone. Still, the Court continues.

### ii. Pervasive or Severe—Element Three

As explained above, Title VII does not offer redress for all hostile work environments; only those that exist because of discriminatory animus. But Title VII also does not provide a remedy when an employer creates an unpleasant work environment, or one that is only hostile on occasion. Apart from being caused by discriminatory animus, the hostility must be severe or pervasive to the point of altering the conditions of employment. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005).[3]

---

[3] The Court is unclear whether Chen's Title VII complaint is based on a hostile work environment, constructive discharge, or both. Regardless, if Chen cannot meet the burden for a Title VII claim based on hostile work environment, she certainly cannot meet the higher burden for a claim based on constructive discharge. *See, e.g., Cooper-Schut v. Visteon*

The Seventh Circuit clarified the severe or pervasive analysis in *Gates v. Board of Education of Chicago*, 916 F.3d 631 636–38 (7th Cir. 2019). The idea that plaintiffs must have suffered a "hellish" work environment died with the Supreme Court's decision in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993). There, the Supreme Court explained that "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Id.*; *Gates*, 916 F.3d at 637. Instead, certain factors are relevant to aid in determining whether the workplace was sufficiently hostile: severity, frequency, whether it was physically threatening, or whether it unreasonably interfered with the plaintiff's work performance. *Gates*, 916 F.3d at 637.

Furthermore, in *Gates*, the Seventh Circuit reversed a district court's grant of summary judgment to the defendants in a hostile work environment case. There, the plaintiff was subjected to racial slurs and inappropriate so-called jokes. The district court had determined that the conduct was not sufficiently severe or pervasive. The Seventh Circuit, however, stressed that racially toxic comments made by supervisors are much more serious than comments made by a coworker.

---

*Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004) (finding that a plaintiff's Title VII constructive discharge claim failed because the racial harassment the employee experienced was "mild"); *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 658 (7th Cir. 2001) (distinguishing "ordinary" Title VII harassment claims based on hostile work environment and "aggravated" if based on constructive discharge). Because the Court ultimately finds that Chen has not met the burden for an "ordinary" Title VII claim based on hostile work environment, an analysis of Chen's constructive discharge claim is not necessary. *Bannon v. Univ. of Chicago*, 503 F.3d 623, 629-30 (7th Cir. 2007) ("Because we have decided that Bannon has not made the necessary showing to support her hostile work environment claim, it follows that her constructive discharge claim fails.").

*Id.* at 638. "This is particularly true when supervisors address these derogatory and humiliating remarks directly to the employees in question." *Id.*

Here, though not as severe, Chen's case is similar to the Seventh Circuit's recent decision in *Mahran v. Advocate Christ Medical Center*, 2021 U.S. App. LEXIS 26384, __ F.4th __ (7th Cir. June 3, 2020). There, the plaintiff asserted a hostile work environment based on his employer denying him "specialized ICU training, paying him less than other pharmacists, rejecting his request for vacation time, hiring non-Muslims as full-time pharmacists before him, and disciplining and later firing him." *Id.* at *15–16. But the court determined that he had not established that any conduct was objectively offensive. "He was denied ICU training not because of his race or religion but because he was not hired to be an ICU pharmacist," he presented no evidence of other similar pharmacists being paid more than him, he was denied time off for vacation because too many other employees (also Muslim) had already asked for time off for that holiday, and the individuals hired over him were chosen because they had prior experience. *Id.* at *16–17. As in the present case, Mahran's complaints were easily explainable, and he failed to show that the justifications were a smokescreen. Viewed in totality, none of the issues Chen points to were objectively offensive, and none can amount to a hostile work environment. The Secretary's brief refers to the subjectively and objectively offensive requirement of the first element of the hostile work environment claim, but she primarily relies on the severe or pervasive prong. Regardless of which

26

element this evidence addresses, the conduct complained of is so mild that it cannot be considered severe or pervasive because it is not even objectively offensive.

Chen accused her supervisors of creating the hostile work environment. Because the allegations center around conduct of her supervisors, the bar is lower. Supervisors simply have an easier path to successfully altering the conditions of employment because they possess more power over the day-to-day work life of the employees entrusted to their management. *See Gates*, 916 F.3d at 638. But although Chen complains of actions perpetrated by her supervisors, and even though she proffers a significant number of complaints, her complaints are neither physically threatening nor severe (or even hostile at all in some cases).

In support of her hostile work environment theory, Chen primarily asserts that Kilmnick laughed at her accent, Solano failed to upgrade her laptop computer, they were deaf to her requests for evaluations and promotions, yelled at her, kept secret notes on her, and subjected her to a criminal investigation. Dkt. 226, at 21. These allegations, however, are largely unsupported by the record. In most instances, Chen grossly misrepresents the situation, assumes discriminatory animus, or fails to establish that the legitimate, nondiscriminatory explanation was pretextual. Taken as whole, however, no reasonable jury could conclude that Chen was subjected to a hostile work environment. Such a conclusion can only be reached through irrational speculation. *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 928 (7th Cir. 2020) (explaining that on summary judgment the Court asks "whether a verdict in her favor would be reasonable or could result only from irrational speculation.").

27

Chen accused Kilmnick of laughing at her accent. She provides no details, and her response to the Secretary's statement of fact that Kilmnick denies laughing at her accent cites no evidence in the record (not even her deposition). Her brief similarly contains no citation to evidence. Instead, her response to the statement of fact merely stated that it was more than once, that he told her to speak in a monotone voice, and that he asked her what *she* was laughing at. Dkt. 223, ¶ 65. Thus, she has not met her burden on summary judgment. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009). Next, the evidence presented does not support her theory that her computer troubles were in any way harassing, hostile, or discriminatory. Solano approved Chen's technology trouble tickets within hours of the requests and then followed up many times over email to attempt to resolve the issues and get Chen a new computer.

Even if Solano should have recorded more case file reviews for Chen, the main complaint is Solano's writing of the departure rating with a negative narrative. But Chen puts forth no evidence that the negative comments in the departure rating were untrue or hostile. Instead, the evidence merely shows a supervisor that was not happy with a subordinate's performance and felt the need to fully explain her opinion (including the need to attach examples as evidence). Sure, Chen wanted that departure rating removed, and she wanted Kilmnick to do another evaluation and to use that as her mid-year review instead. But that isn't the rule. And even if her supervisors were wrong—even if they mistakenly followed the wrong protocol—that mistake would not be evidence that their actions were a

pretextual guise to deploy discriminatory animus. *Hnin v. TOA (USA), LLC*, 751 F.3d 499, 506 (7th Cir. 2014).

The Court can find only one instance of yelling that may have been directed at Chen, and even that was confusing. Chen claims she was yelled at, and Kilmnick apologized to her for yelling. His notes and testimony explained that Chen was the person yelling. But even if it were Kilmnick doing the yelling, that one incident is not nearly severe and pervasive enough to create a hostile work environment.

Kilmnick admits that he took notes on his interactions with Chen. She began accusing him of discriminatory animus as soon as he became her supervisor, and he wanted to document their interactions to ensure everything was recorded. But even if this behavior was wrong, Chen cannot establish that it was severely hostile toward her. In her response brief, she conceded that she was not aware of Kilmnick's notes until after her employment at the IRS ended. She asserted,

> A reasonable person may draw the conclusion that if Chen would have known the secret notes and what the IRS was thinking about stabbing her in the back side or anything else critical, and allowing IRS to make use of secret notes and testimonies *which were not brought to Chen attention at the time she was employed* would be unfair.

Dkt. 226, at 22 (emphasis added). Indeed, she is the one that dubbed the notes "secret." But if she was not aware of Kilmnick's notes, then she cannot assert later that the notes created a hostile work environment. *Whittaker*, 424 F.3d at 645; *accord Cottrill v. MFA, Inc.*, 443 F.3d 629, 636 (8th Cir. 2006) ("Because she did not subjectively perceive the peeping, Cottrill may not rely on the peeping to establish that her work environment was hostile.").

Chen points to the purportedly criminal investigation and the cloud that it cast over her. But she provides no explanation how it could do that when she did not know about it. The same logic applies here; how can the unknown constitute a hostile work environment? Nevertheless, the investigation was not criminal. No evidence exists that it was. On the contrary, the evidence expressly categorized the investigation as non-criminal. And the investigation began because of Chen's actions. She performed background research on her bosses, jumped to the conclusion that they were having an affair, and then broadcast that conclusion to at least one other co-employee. When they learned of her research and her accusation, they were very reasonably concerned. And even if their referral of her inappropriate activity to TIGTA was the wrong move, Chen presents no evidence that it was done as a pretext to discriminate.

Other times, Chen makes references to other complaints, though her brief does not develop arguments applying the law on these points to those facts. For example, she references the meeting in which Solano explained how a person can be fired. Chen has painted a picture in which Solano was an overbearing boss. But if the picture she paints is true, Solano was an overbearing boss to everyone. That does not help any argument that Solano was overbearing to Chen because of her race or national origin. On the contrary, it shows Solano indiscriminately treating everyone poorly (assuming, again, if Chen's interpretation of the facts were true). As another example, she took issue with being asked to work a standard five day per week, eight hours per day schedule when she joined Kilmnick's team (which was

30

a promotion). She asserts that others were not asked to do that. But she ignores the fact that she was the only one in training on his team and that he wanted her to work the same schedule as the individuals training her. Chen provides no evidence as to how that justification was pretextual.

One final note before moving on to Chen's retaliation claim. The Court has taken great care to outline as many of Chen's complaints as possible. She did not include all of them in her briefing. When she did include facts, she almost always failed to include citations to evidence (not to mention her failure to cite relevant legal authority). But because she is pro se, the Court has done its level best to include and discuss her complaints in detail. At bottom, however, none of them amount to a hostile work environment. Rather, they show an employee jumping to conclusions and issuing accusations of discrimination instead of taking a moment to see the other perspective; the legitimate, nondiscriminatory reason for her supervisors' actions (or even addressing those justification later in her briefing). At times, the Court has seen evidence of employees at the IRS doing things that might be considered improper or at least ill-advised but not illegal. Solano admitted to being a bit too aggressive in her supervisory approach in the beginning (toward everyone). Lesia Panepinto broke confidence and told Kilmnick what Chen had told her in confidence (though the record does not make her obligations clear). But none of these facts, taken as a whole, lead to the conclusion that Chen's supervisors or coworkers created a hostile work environment, let alone one based on Chen's race or national origin. Chen may have been displeased with their actions. But this Court is

31

not a super-human resources department, and Title VII provides redress only for *discriminatory* employment actions. *Liu v. Cook Cnty.*, 817 F.3d 307, 318 (7th Cir. 2016). Finding none, the Court must grant the Secretary's motion for summary judgment.[4]

### b. Count II—Retaliation

In Count II, Chen brings a claim of retaliation. Title VII prohibits employers from retaliating against employees because they have "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3. To establish a Title VII retaliation claim, a plaintiff must prove that she engaged in a protect activity, suffered an adverse employment action, and that the employer took the adverse action because of her protected activity. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). Here, the Secretary contends that Chen has not suffered an adverse employment action, and that even if she could, she cannot prove a causal link. Dkt. 15. Thus, the Secretary does not challenge whether Chen was engaged in protected activity.

---

[4] Chen also urges this court to accept microaggression as evidence of a hostile work environment. She faults the Secretary for not including case law that contemplates microaggressions. Dkt. 226, at 27. She then cites to the Harvard Business Review and to American Psychologist; neither are relevant to federal employment discrimination law. But her invocation of the concept of microaggressions misses the point. Regardless of whether an aggression is micro or macro, the Court considers the evidence of hostility in totality. If the combination of conduct sums up to be severe or pervasive, then it is enough. If it doesn't, then it is not. Whether the sum comes from a large number of small incidents, or a small number of larger incidents, the result is the same. Here, her cited incidents do not add up to a hostile work environment, no matter what label they are assigned.

To constitute an adverse employment action in the retaliation context, the employer's action must "dissuade a reasonable employee from engaging in the protected activity." *Williams v. Bd. of Educ.*, 982 F.3d 495, 509 (7th Cir. 2020). Then, the plaintiff must establish the causal link between the adverse action and her engagement in the protected activity. Under Title VII, however, the plaintiff is required to show that her engagement in the protected activity was the but-for cause of the employer's adverse employment action. *Chatman v. Bd. of Educ. of Chicago*, 5 F.4th 738, 748 (7th Cir. 2021). That requirement is fatal to Chen's Title VII retaliation suit. Even if she were subjected to an adverse employment action, she has not established that her engagement in any protected activity was the but-for cause of the adverse employment action. On every point, the Secretary has shown a legitimate, nondiscriminatory justification for any action Chen's supervisors took. Still, when an employer presents such a non-retaliatory reason, "a plaintiff can still raise a genuine dispute with evidence that the proffered reason is a smokescreen for an unlawful motive." *Blankenship v. Am. Phoenix, Inc.*, 795 F. App'x 467, 469 (7th Cir. 2020) (citing *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 863–64 (7th Cir. 2015)). But Chen has presented no evidence of pretext.

In her response brief, Chen contends that she was retaliated against for filing her EEOC charge when her supervisors "planned a criminal investigation somewhere within IRS." Dkt. 226, at 5. As bad as that sounds, it is not supported by the evidence. Her contention that her managers planned a criminal investigation amounts to pure, irrational speculation. She asserts, "Defendant did not provide

any facts to demonstrate that Plaintiff was not shocked to hear that and that was not intimidated more that it could be expected by another employee counterpart born in US and of a difference race." *Id.* She continues, "Logically, to defeat the count of retaliation, the defendant should have provided facts to show that Plaintiff was not intimidated at all by their action of bringing a criminal investigation into play such that Plaintiff read the statements supposedly written by Solano during the EOCC [sic] proceeding." *Id.* at 6.

Chen's argument contains multiple errors in law and fact. Kilmnick and Trier explained that TIGTA was contacted because Chen was performing background checks on them and had expressed her opinion that they had engaged in an extramarital affair based on information Chen learned in her investigation. Kilmnick explained that this discovery made him feel uneasy about his future safety and reputation. The investigation was never transformed into a full-fledged investigation, was never criminal, and was ultimately referred to the Employee Conduct and Compliance Office. The record contains no evidence that anyone ever performed a criminal investigation on Chen, her repeated assertions to the contrary notwithstanding. And even though Chen views the law as placing the entire burden on the Secretary, she has failed to show that the legitimate, nondiscriminatory, and nonretaliatory justification described above was a mere smokescreen; a lie. Nor has she seriously attempted to do so.

Chen alludes to comments made by Solano. *Id.* at 7. Those comments do not help Chen. Solano stated in her deposition that she believed Chen quit because of

the TIGTA investigation. Solano also pointed out that she had no personal knowledge about it, had not talked to anyone involved, and only believed that because of her knowledge of Chen "as a very private person." Dkt. 190-6, Solano Dep. 47:10–24, 48:1–23. In other words, she was speculating. That is not evidence. Furthermore, even if Chen did resign because of the TIGTA referral, that would not be enough to establish pretext. Chen's response to the investigation cannot change Kilmnick's underlying reason for initiating it. Chen's reaction says nothing about Kilmnick's motivations.

In her response brief, Chen also avers that "she was told by a telephone technician that he could not figure out why Chen's wires are re-route to another server." Dkt. 226, at 7. The Court has no idea what this hearsay means, or how it is relevant. Furthermore, Chen did not include this in her statement of additional facts. "We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . .." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

The Court can locate only two other possible arguments in Chen's brief that could support her claim of retaliation. First, she points to timing. She asserts that the TIGTA investigation began soon after she filed with the EEOC. But the Seventh Circuit has made clear that suspicious timing alone is rarely sufficient to survive a summary judgment motion on a retaliation claim. *Williams v. Bd. of Educ.*, 982 F.3d 495, 509 (7th Cir. 2020) (*citing McCann v. Badger Mining Corp.*, 965 F.3d 578, 592-93 (7th Cir. 2020). Here, the only evidence other than timing is that Kilmnick

35

told Agent Johnson that Chen had an open EEOC complaint when Kilmnick called TIGTA about Chen's activity. Those two things taken together, however, are not enough to create a dispute of fact regarding pretext. Chen's pre-EEO counseling request was filed on August 21, 2007, and her EEO complaint was filed on October 12, 2007. Kilmnick's contact with TIGTA regarding Chen's conduct was on November 2, 2007. The timing is close, but not immediate. Kilmnick admitted that he told Johnson about Chen's EEO complaint. That alone does not do much to bolster Chen's retaliation claim. But even it did, Chen's EEO complaint almost exclusively confines itself to Chen's employment in Solano's group. Indeed, Chen barely mentioned Kilmnick, or her time under his management. She claimed that Solano continued to contact Kilmnick to criticize Chen's work. And she noted that, even with Solano's assertions, Kilmnick became more relaxed and showed more confidence in her work after she completed a sample case and that he "said that I was doing an excellent job." Dkt. 188-3, at 9. Other than that, her only mention of Kilmnick was his use of Solano's departure rating as Chen's mid-year appraisal. *Id*.

She also asserted that Trier told her that she did not want employees in her group that would file EEO complaints. That is a dispute of fact, because Trier testified that she said no such thing. Chen does not raise this argument in her response though. And even if she did, the evidence shows that Kilmnick called TIGTA, that he was the one concerned for his safety and reputation, and that he only involved Trier to see if she agreed with him and because her reputation was also implicated.

36

In other words, Chen's retaliation claim requires the Court to credit her speculation that Kilmnick retaliated against Chen for filing an EEO complaint that barely mentioned him and that noted his praise for her. It also requires that the Court credit such speculation even though Kilmnick had good reasons to refer her conduct for investigation and that both he and his Territory Manager agreed that the referral was appropriate. These were two people that were not in Chen's chain of command during the events leading to her EEO complaint.

Because no reasonable jury could find for Chen, she has failed to present sufficient evidence to establish a dispute of material fact.

### III.    Conclusion

For the reasons explained above, the Court grants the Secretary's motion for summary judgment [186] on all counts. Civil case terminated.

Date:  September 16, 2021

Honorable Iain D. Johnston
United States District Judge